NATIONAL RISK MANAGEMENT, INC.
and National Risk Management
Consulting, Inc.

v.

David G. BRAMWELL, Martin D. Rakoff, A.V. Consultants, Inc., Consolidated Risk Services, Inc., Comprehensive Benefits Services Co., Inc., Dennis Ryan, Andre Duggin, Russell Naylor, and John Woods.

No. 92–4366.

United States District Court,
E.D. Pennsylvania.

March 31, 1993.

E. Harris Baum, Edward J. McKenna, Zarwin & Baum, P.C., Philadelphia, PA, for plaintiffs.

Louis Rosner, Philadelphia, PA, for defendants Bramwell and Rakoff.

Charles R. Floyd, Jr., Ronald A. White, P.C., Philadelphia, PA, for defendant A.V. Consultants, Inc.

Keith E. Johnston, Wilson, Elser, Moskowitz, Edelman & Docker, Philadelphia, PA, for defendants Comprehensive Benefits Service Co., Inc. and John Woods.

John A. Guernsey, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for defendant Naylor.

### FINDING OF FACTS AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

Plaintiffs in their Amended Complaint make claims against various defendants for Copyright infringement, Breach of Contract, Breach of Fiduciary duty, Trade Secret infringement, and Tortious interference with Contract.[1] The case is before me on a Motion by the plaintiffs for a Permanent Injunction and for damages suffered.

After a non-jury trial in the above captioned case, and after consideration of the arguments and submissions of counsel, the court enters the following Findings of Fact and Conclusions of Law.

## I. Findings of fact:

### A. *The parties:*

1. Plaintiff, National Risk Management, Inc. (hereinafter "NRM, Inc.") is a Delaware corporation with its principal place of business located at 1288 Valley Forge Road, Valley Forge, Pennsylvania.

2. Plaintiff, NRM Consulting, Inc. (hereinafter "NRM Consulting") is a Pennsylvania corporation with its principal place of business located at 1288 Valley Forge Road, Valley Forge, Pennsylvania, 19481. Plaintiffs, NRM, Inc. and NRM Consulting, are primarily in the business of marketing a self-funded workers compensation self-insurance program.

3. Defendant, David G. Bramwell (hereinafter "Bramwell") is a citizen and resident of the Commonwealth of Pennsylvania residing at 431 Hill Crest Avenue, Glenolden, Pennsylvania, 19036.

4. Defendant, Martin D. Rakoff (hereinafter "Rakoff") is a citizen and resident of the Commonwealth of Pennsylvania residing at 104 Lehigh Road, Coatesville, Pennsylvania.

5. Defendant, Comprehensive Benefits Service Company, Inc. (hereinafter "CBSC") is a Pennsylvania Corporation with its principal place of business located at 740 East Lancaster Pike, Exton, Pennsylvania, 19341. CBSC is a wholly owned subsidiary of Employee Benefits Plans, Inc. (hereinafter "EBP"), Minneapolis, Minnesota. CBSC/EBP is in the business of marketing employee benefit plans which did not include self-funded workers compensation self-insurance programs.

6. Defendant, A.V. Consultants, Inc. (hereinafter "A.V.") is a Pennsylvania corporation with its principal place of business located at 740 E. Lancaster Pike, Exton, Pennsylvania.

7. Defendant, Consolidated Risk Services, Inc. (hereinafter "CRS") is a Pennsylvania Corporation with its principal place of business located at 740 E. Lancaster Pike, Suite 160, Exton, Pennsylvania.

8. At all times material to Plaintiffs' Complaint and until August 23, 1992, Dennis Ryan, Esquire (hereinafter Ryan) was Chief Operating Officer of CBSC/EBP. Commencing on or about August 24, 1992, Ryan became an employee/officer of A.V. holding the title of President. At all times material hereto, Ryan has been a 2% shareholder of A.V.

9. At all times material to Plaintiffs' Complaint and after August 4, 1992, Ryan

---

1. Plaintiffs also asserted a claim against defendants for a violation of the RICO Act. I dismissed this claim, however, prior to trial.

has also been an investor/shareholder of Defendant, CRS. Ryan also holds the title of President of CRS.

10. At all times material to Plaintiffs' Complaint and until November of 1992, A.V. and CBSC/EBP conducted business out of Suite 200, 740 East Lancaster Pike, Exton, Pennsylvania.

11. Beginning May 20, 1991 to the present, John Wood has been the Vice President of Administration for CBSC/EBP.

12. James Oakley is the majority shareholder of NRM, Inc and NRM Consulting.

### B. Bramwell and Rakoff are hired:

13. Beginning July 1, 1986 and continuing until December 8, 1988, Defendant Bramwell was employed by NRM, Inc. Beginning January 2, 1990 and continuing until July 8, 1992, Defendant Bramwell was re-employed by NRM.

14. Beginning June 1, 1988 and continuing until July 17, 1992, Defendant, Rakoff, was employed by NRM, Inc. as a marketing manager.

15. Both Bramwell and Rakoff were employed in positions of trust and confidence with Plaintiff corporations.

16. Neither Bramwell nor Rakoff were employed by Plaintiff corporations pursuant to valid written employment contracts.

17. After Bramwell began employment he was presented with a draft of an employment contract by Paul Luckman, Esquire, who was an employee of NRM. Bramwell reviewed the draft and advised Luckman that the draft was inconsistent with the terms of his agreement with Oakley. The agreement contained a restrictive covenant which had not previously been discussed or agreed to by Bramwell. Bramwell never signed the agreement.[2] No further action was taken as to the agreement and it was never signed.

18. Prior to commencing employment in June of 1988, Rakoff met with Oakley and agreed upon the terms and conditions of his employment. Sometime after he reported to work, Rakoff was presented with a draft of an employment agreement to review. He had some discussions with Oakley and a draft was partially marked up. Oakley agreed to make the changes Rakoff had suggested on the draft. However, there was no further follow-up and the draft was never signed.

19. Had defendants signed the employment contracts in question, the contracts would be unenforceable as they were presented for signature after commencement of employment and lacked proper consideration.

### C. A failed attempt at a joint venture:

20. In or about December of 1991, representatives of CBSC/EBP met with representatives of NRM, Inc. to discuss the feasibility/possibility of the two companies becoming involved in a joint venture.

21. Sometime in the spring of 1992 another meeting was held at which Oakley was present along with Rakoff and Ken Shenkle, another employee of NRM, Inc. Mr. Wood was present on behalf of CBSC. Edward Palmer of the Palmer Insurance Agency also attended the meeting.

22. Immediately prior to this second meeting, Edward Palmer suggested to Ken Shenkle that CBSC/EBP might desire to purchase NRM, Inc. Ken Shenkle advised Edward Palmer that NRM, Inc. was not for sale.

23. CBSC/EBP and NRM, Inc. exchanged information regarding their respective businesses with respect to the joint venture. This information included at a minimum NRM's Proposal Book, which explains the essence of the Self–Funded Program and also contains a non-exclusive list of NRM's clients and Producers who serve as references to prospective clients.

24. During one of the meetings between the two companies Rakoff presented NRM, Inc.'s standard slide presentation used as a sales pitch to prospective clients in presenting and explaining their product.

---

**2.** Bramwell did sign an agreement during his initial employment with NRM, Inc. in 1986. However, he left that employment in 1988 and that agreement is not in issue nor involved in this proceeding.

25. The representative of CBSC/EBP (John Wood) supplied to the representatives of NRM, Inc. information regarding the volume of claims handled by CBSC/EBP, proposal request forms, summaries of services and advertisements.

26. An additional meeting was to be scheduled between Andrea Mathias of CBSC/EBP and Susan Rose of NRM, Inc. The purpose of this meeting was to discuss the technical aspects of the program and to exchange computer information. This additional meeting never took place.

27. After some time had passed and no further meetings were scheduled, the discussions between the two companies broke down as both sides seemed to grow less interested in the joint venture.

### D. *Opportunity knocks and Bramwell is fired:*

28. Dennis Ryan, who was involved in the discussions on behalf of CBSC, concluded on his own that the joint venture concept was of interest and he set out to find investors who might be interested in the concept being discussed by CBSC and NRM.

29. Ryan sought investors and entered into discussions with Bramwell and Rakoff about creating a company that would allow Rakoff and Bramwell to carryout the 24 hour a day coverage that was the subject of the proposed joint venture. Ryan's actions in this respect were not taken on behalf of CBSC.

30. In early July, 1992, Dolores O'Donnell of NRM, Inc. advised Oakley that she had learned that Bramwell was interviewing for employment with another company. Oakley requested that O'Donnell instruct Bramwell to meet with him on the issue.

31. Bramwell met with Oakley and confirmed that he was interviewing with another company. Bramwell also mentioned that Rakoff had likewise been interviewing with the same company. That same evening Oakley telephoned Rakoff. Oakley advised Rakoff that he was aware he was interviewing for a job along with Bramwell.

32. Rakoff and Bramwell were instructed to meet with Mr. Oakley at NRM's offices.

At the meeting Oakley explained his displeasure with Bramwell and Rakoff's actions and instructed them to see if any other officer could support their actions or would stand behind them in their efforts to keep their jobs.

33. Rakoff was able to find support from Ken Shenkle and he convinced Oakley not to terminate his employment.

34. Bramwell was not as fortunate. Bramwell was unable to find any support among the other officers of the company. Bramwell's employment was terminated after further discussions with Oakley.

35. Ms. Rose met individually and in committee meetings with the other officers of Plaintiff corporations with regard to Rakoff's actions.

36. After attending several hours of committee meetings, Ms. Rose informed Mr. Rakoff of the Plaintiff corporations' position with regard to his continuing employment at NRM, Inc.

37. Ms. Rose advised Mr. Rakoff that the company was placing him on a one year monitoring period.

38. During this one year period, a new employee would be hired and trained by Rakoff for Rakoff's position. If at the end of the one year period Rakoff had performed satisfactorily, the officers would reconvene to determine whether or not Rakoff would be terminated.

39. Rakoff accepted the companies' proposal.

40. On July 15, 1992, after the new arrangement was in place, Ms. Rose witnessed Mr. Rakoff give a presentation on NRM, Inc.'s behalf.

### E. *The Aliquippa Hospital incident and Rakoff is fired:*

41. In the summer of 1992, Rakoff marketed the NRM, Inc. self-funded workers compensation self-insurance program to Mike Winarski, the vice-president of finance of Aliquippa Hospital.

42. Aliquippa Hospital, through Mike Winarski, advised Mr. Rakoff that the hospital

desired to enter into contractual relations with NRM, Inc. to begin using NRM, Inc.'s self-funded workers compensation self-insurance program.

43. Rakoff presented the contractual documents between NRM, Inc. and Aliquippa Hospital to Mike Winarski.

44. In the end of June, 1992, Mike Winarski returned the signed contract documents to Rakoff.

45. Rakoff retained the signed contract documents in his possession and did not advise anyone at NRM, Inc., other than Bramwell, that he possessed the signed contracts.

46. On July 17, 1992, Rakoff telephoned NRM, Inc. and advised the company that one of his parents was ill and that he had to go to New York to visit.

47. Although Rakoff's parent was ill, he did not go to New York.

48. On July 17, 1992, Rakoff reappeared at Aliquippa Hospital and presented to Mike Winarski another set of unsigned contract documents for a self-funded workers compensation self-insurance program.

49. Rakoff stated to Winarski that he had started his own business and that the documents were similar to the ones Winarski signed with NRM, Inc., except that Rakoff wanted Winarski to sign these contract documents with Rakoff's new company.

50. Winarski took the documents from Rakoff and told him he would review them.

51. After Rakoff left Winarski's office, Winarski telephoned his insurance agent. Aliquippa had used in the past as well as in conjunction with NRM, Inc.

52. The agent telephoned Jim Oakley and advised Mr. Oakley what Mr. Rakoff had done.

53. Mr. Oakley telephoned Mr. Winarski to apologize and offered to fly immediately to Aliquippa (located outside Pittsburgh near Ohio) with other officers of NRM, Inc. to clear up the problem.

54. Mr. Winarski suggested Mr. Oakley come to Aliquippa on July 20, 1992. Mr. Oakley and other officers flew to Aliquippa and met with Mr. Winarski at 7:00 a.m. on Monday, July 20, 1992.

55. The night of July 17, 1992, Mr. Oakley reached Rakoff by phone. The Aliquippa incident was discussed and Rakoff acknowledged the occurrence as described by Mr. Winarski.

56. The night of July 17, 1992, Mr. Oakley terminated Rakoff from the employ of NRM, Inc.

57. The documents presented to Mike Winarski on July 17, 1992 were prepared by Bramwell for Rakoff to take to Aliquippa. The letterhead identifying the documents as "A.V. Consultants" was supplied to Bramwell and Rakoff by Dennis Ryan.

58. Bramwell and Rakoff consummated their negotiations with the investor group and executed contracts of employment on or about July 21, 1992. The contracts called for them to commence their new employment on or about September 1, 1992, or earlier, if so agreed by the parties.

59. Since entering into their new employment, Bramwell and Rakoff have not attempted to solicit any of plaintiffs' clients under contract nor have they sought to compete with plaintiffs where plaintiffs had proposals pending. Nor have Bramwell or Rakoff attempted to discourage any other entities or individuals from doing business with plaintiffs.

F. *Copyright infringement*[3]:

60. Prior to September 26, 1980, Ron Wilson in connection with Gerry Katz an attorney with a law firm in Washington D.C., developed a workers compensation program utilizing a "501(C)(3) trust.

61. The actual documents, although reviewed by Katz were generated by one of Katz's associates, Barbara Schloff.

---

**3.** Plaintiff's seek protection for the trust agreement, the administration agreement and the claims agreement found in plaintiff's exhibit 9a.

62. This program was developed as part of a work assignment for Greater Southeast Community Hospital in Washington, D.C.

63. The creation of the trust was begun prior to any association Wilson had with Oakley.

64. Oakley did not become active in the trust program until after the original trust program was set up for Greater Southeast Community Hospital.

65. After the trust program was created, Oakley began to compile a series of documents concerning the program and its components. Oakley had the documents copyrighted in both his and Wilson's name. The documents were copyrighted without Wilson's prior knowledge.

66. Wilson and Oakley received a Certificate of Copyright Registration dated and identified as # TXU 53–051, September 26, 1980, "Workers Compensation: A Cooperative Self–Funded Method".

67. The copyrighted administration agreement documents included in exhibit p–9a are substantially similar to the documents created for the Southeast Community Hospital (exhibit Rakoff & Bramwell 14a).

68. Plaintiffs' exhibit 9a, the copyrighted material, contains material not written by either Wilson or Oakley nor any one on their behalf and which plaintiff appears to have conceded in closing that it was not now seeking to protect.

69. The trust agreement used by Rakoff and Bramwell subsequent to their proposal to Aliquippa was created by attorney Barbara Freedman independent of any NRM documents or material or any material input by Rakoff or Bramwell.

70. Unlike plaintiff corporations, CRS (the company for which Bramwell and Rakoff work) does not provide claims adjusting. Claims are handled by an outside independent company.

71. Uncollateralized bonds, while difficult to obtain, are available on the market.

72. General Reinsurance Corporation created a matrix program for payment of claims over a five year period. This policy which covers losses per accident per payment year is known as PAPY. While the same type of coverages are provided by other companies, the name PAPY is exclusive to General Reinsurance. PAPY is a form of pay/loss aggregate coverage.

73. Wilson and Oakley, were one of the first to use PAPY.

74. The program that they desired to set up, however, did not require a five year matrix, so they negotiated with General Reinsurance for a one year matrix program only.

75. Oakley came up with the name AGIT-ISH for the system of aggregate insurance they would be utilizing in the self-funded insurance program.

76. Wilson and Oakley licensed to Wilson–Oakley National, Inc. for utilization the copyright work entitled "Worker's Compensation: A Co-operative Self Funded Method".

77. Subsequently, Wilson–Oakley National, Inc.'s rights with respect to the copyright "Worker's Compensation: A Co-operative Self–Funded Method" were transferred to Oakley National, Inc., which later underwent a name change to National Risk Management, Inc.

78. On September 23, 1983, James F. Oakley, III licensed to National Risk Management, Inc. the use of copyright # TXU–53–051 dated September 26, 1980.

79. During the course of employment with NRM, Inc. and NRM Consulting, Bramwell and Rakoff, were employed in positions of trust and confidence with NRM, Inc. and NRM Consulting and had access to the copyright program # TXU–53–051 and all documents derived therefrom.

80. Susan Rose, in her position of employment with NRM Consulting, copyrighted various computer programs. Such programs have not yet received copyright registration.

81. During the course of their employment, Bramwell and Rakoff had access to all of Plaintiff corporations' proprietary trade secret information with respect to administering the "Workers Compensation: A Co-operative Self–Funded Method".

82. Plaintiff corporations, however, have failed to take substantial steps to prevent the disclosure of their proprietary trade secret information.

83. Bramwell and Rakoff have not taken the Plaintiff corporations' copyrighted program, computer programs nor proprietary trade secret information in violation of any fiduciary duties owed to Plaintiff corporations.

84. Bramwell and Rakoff have not disclosed to Andre Duggin, Dennis Ryan, John Wood or others Plaintiff corporations proprietary trade secret information, nor is there any likelihood that any trade secrets will be revealed.

85. Contrary to plaintiffs' assertion, very little, if any, of the alleged copyright work is original to James Oakley. The original trust document, for example, was prepared by attorney Barbara Schloff. Ronald J. Wilson was responsible for a substantial amount of the remaining material. Mr. Wilson is also listed as an author and co-owner of the copyright.

G. *Breach of Contract:*

86. Shortly after the commencement of Rakoff's employment with NRM, Inc., he was presented with but did not sign a written employment contract.

87. The terms of the proposed employment contract in pertinent part provided:

2. Definition of Terms

2.1 "Program" means "The Co-operative Self–Funded Workers Compensation Trust Program developed, copy written and licensed by the company.

2.2 "Existing Accounts" shall mean any existing accounts serviced by "company" during the term of Rakoff employment.

7. Non–Interference

"RAKOFF" agrees that in the event he leaves the employ of "COMPANY" for a period of two years from the date thereof, he will neither directly nor indirectly, as an employee, stockholder or partner of any firm, corporation or otherwise compete or otherwise perform any service for any existing accounts of the "COMPANY". "RAKOFF" recognizes and acknowledges that the program of "COMPANY" is proprietary and unique and will not be divulged at any time without the express written consent of "COMPANY".

88. Rakoff and NRM, Inc. did not enter into a valid binding employment contract.

89. Bramwell was employed with NRM, Inc. related companies on two separate occasions.

90. During Bramwell's first period of employment with NRM, Inc., he was presented and signed a written contract of employment.

91. Bramwell's initial employment contract provided in pertinent part:

2. DEFINITION OF TERMS

Unless a different meaning is plainly implied by the context, the following terms used in this Agreement shall have the following meanings:

2.1 "PROGRAM" means "THE COOPERATIVE SELF–FUNDED WORKERS COMPENSATION TRUST" program developed, copy written and licensed by the "COMPANY".

2.2 "EXISTING ACCOUNTS" shall mean any existing account serviced by "COMPANY" during the term of "DAVID'S" employment.

7. NON–INTERFERENCE

"DAVID" agrees that in the event he leaves the employ of "COMPANY" for a period of two years from the date thereof, he will neither directly nor indirectly, as a employee, Stockholder or Partner of any firm, corporation or otherwise compete or otherwise perform any service for any existing accounts of the "COMPANY". "DAVID" recognizes and acknowledges that the program of "COMPANY" is proprietary and unique and will not be divulged at any time without the express written consent of "COMPANY".

92. During Bramwell's subsequent period of employment, he was presented a written employment contract by Paul Luckman.

93. Mr. Bramwell did not sign the employment contract.

94. Paul Luckman prepared the second employment contract regarding Bramwell.

95. The second proposed Bramwell employment contract provided in pertinent part:

3.1 "PROGRAM" means "THE COOPERATIVE SELF–FUNDED WORKERS (Workers Compensation: A cooperative self-funded method COMPENSATION TRUST") program developed, copy written and licensed by the COMPANY.

3.2 "EXISTING ACCOUNT" shall mean any client serviced by COMPANY or any potential client for which COMPANY has submitted a proposal of services during the term of EMPLOYEE'S employment including all brokers, agents, producers and licensee's associated with the Program.

NON–INTERFERENCE

EMPLOYEE agrees that in the event he leaves the employ of COMPANY for a period of two (2) years from the date thereof, he will neither directly nor indirectly, as an Employee, Stockholder or Partner of any firm, corporation or otherwise compete or otherwise perform any service similar to that conducted by COMPANY for any existing accounts of the COMPANY. EMPLOYEE recognizes and acknowledges that the program of COMPANY is proprietary and unique and will not be divulged at any time without the express written consent of COMPANY.

96. Bramwell and NRM Consulting did not enter into a valid and binding employment contract.

H. *Unfair trade secret infringement:*

97. Defendants have not misappropriated Plaintiff corporations' trade secrets nor are they using Plaintiff corporations' business information to compete unfairly in the market place.

98. The information which plaintiffs seek to keep a secret has not been held in confidence by the company as is required to maintain trade secret status.

99. Although plaintiffs contend that their self-funded program is proprietary and consists of trade secrets, plaintiffs program, its components and operation are fully described in plaintiffs' proposal book which is distribut-ed at Trade shows and seminars and to prospective clients. Much of this information about plaintiffs' program has also been published in articles appearing in trade publications as well as in brochures which have been distributed at seminars and to prospective clients. These distributions also include copies of plaintiffs' non-exhaustive client list, which services as a reference list for prospective clients. An inadequate effort has been made to keep these distributions or the information in them confidential.

I. Tortious interference with contract:

100. Bramwell and Rakoff intentionally interfered with the prospective contractual arrangement between NRM and Aliquippa Hospital.

101. Rakoff's interference occurred at a time when he was still employed by NRM.

102. The conduct of both Rakoff and Bramwell in regard to this matter was outrageous.

103. While NRM, Inc was still able to secure a contractual relationship with Aliquippa Hospital, it did so at an added expense and inconvenience. The tortious interference proximately caused NRM $1,696.00 for which amount they are entitled to recover.

104. The outrageous and intentional nature of Bramwell's and Rakoff's actions also justifies the award of punitive damages to plaintiffs.

105. Ryan was unaware of the fact that Aliquippa had signed the contracts Rakoff had furnished the hospital on behalf of NRM.

II. Conclusions of law:

A. *Copyright infringement:*

 In order to establish copyright infringement a plaintiff must prove ownership of the copyright and "copying" by the defendants. *Sid and Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977); *Educational Testing Services v. Katzman*, 793 F.2d 533, 538 (3d Cir.1986) "Copying," in turn, is said to be shown by circumstantial evidence of access to the copy-

righted work and substantial similarity between the copyrighted work and the defendant's work. *Krofft,* 562 F.2d at 1162.

■ Copyright registration is *prima facie* evidence of the validity of copyright. This evidence, however, is rebuttable. *ETS,* 793 F.2d at 538. Because I conclude that the documents at issued were not copied, I have not ruled on the issue of whether the copyright in this case is valid. Even assuming *arguendo* that plaintiff possesses a valid copyright, there is no violation here as there is no "copying." In determining whether a defendant has copied a protected work, the Third Circuit has applied the reasonable person standard, under which

> the test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value.

*Id.* at 541 (citations omitted).

■ Duplication is not necessary to establish infringement:

> [A]n infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred or reproduced, with more or less colorable alterations to disguise the piracy.

*Universal Pictures Co., Inc. v. Harold Lyoyd Corp.,* 162 F.2d 354, 360 (9th Cir.1947):

■ A limitation on copyright protection is provided by the classic distinction between an "idea" and the "expression" of that idea. *Krofft,* 562 F.2d at 1163. "It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself." *Id.* Only this expression may be protected and only it can be infringed.

With respect to commercial documents, which we have here, the similarity must be more extensive than in the case of mere artistic works in order to justify a finding of substantial similarity. Nimmer on Copyright, § 143.2 at 631.

A copyright does not cover an idea or a system of doing business but only the particular mode of expression of the idea embodied in the copyrighted material. The public is free to use the idea or method of doing business and hence, while the copyrighted description of the idea may not be slavishly copied, the copyright is not infringed by an expression of the idea which is substantially similar where such similarity is necessary because the idea or system being described is the same.

*Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904 (3d Cir.), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975).

■ Such commercial documents, however, are not precluded from the protection of a copyright. Forms used in the insurance industry such as a proposed bond, and affidavit of loss and indemnity agreement, and drafts of an instruction letter and board resolutions can be copyrighted. *Continental Casualty Co. v. Beardsley,* 253 F.2d 702, 704 (2d Cir.), *cert. denied,* 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958). This is not to say that proving infringement comes easily. On the contrary, because of the commercial nature of the forms a showing of infringement requires the demonstration of an appropriation in the exact form or substantially so of the copyrighted material. *Dorsey v. Old Surety Life Ins. Co.,* 98 F.2d 872, 874 (10th Cir. 1938). The court must be mindful in such cases that to prohibit similar language would in effect give the copyright owner a monopoly on his idea, which the courts uniformly deny to copyright owners. As the court stated in *Crume v. Pacific Mut. Life Ins.,* 140 F.2d 182, 184–85 (7th Cir.), *cert. denied,* 322 U.S. 755, 64 S.Ct. 1265, 88 L.Ed. 1584 (1944):

> In the instant situation there is no room for the skill of the mechanic or artisan in utilizing the plan or method disclosed. Its use, to which the public is entitled, can be effected solely by employment of words descriptive thereof. In our view, where the use can be effected only in such a manner, there can be no infringement even though the plan or method be copied. We realize that such a view leaves little, if any, protection to the copyright owners; in fact,

it comes near to invalidating the copyright. This situation, however, results from the fact that the practical use of the art explained by the copyright and lodged in the public domain can be attained solely by the employment of language which gives expression to that which is disclosed.

*Id.*

■ The instant case follows closely in logic to the insurance cases cited above. Plaintiffs' contend that the defendants have copied its trust agreement, administration agreement, and claims agreement, the first two of which are contained in the copyrighted document entitled "Workers Compensation: A Cooperative Self–Funded Method." I have compared the plaintiffs' trust agreement with the defendants' trust agreement and conclude that there is no copyright infringement. The plaintiffs' trust agreement is a 30 page single-spaced document, while the defendant's trust document is 18 pages double-spaced. While there are certain similarities, those similarities are a function of the nature of the document, i.e. a trust agreement, rather than the result of any copyright violation. The trust agreement created by the defendant's certainly does not meet the standard for commercial documents set forth in the above case law.

The same is true of the defendant's administration agreement. The similarities between plaintiffs' and defendants' administration agreement are a function of their nature as commercial documents.

Finally, there is the claims agreement. As noted earlier, CRS does not do its own claims adjusting, but rather has negotiated with an outside company, INSERVCO, to adjust the claims. The evidence at trial indicated that the claims agreement used by the defendants was created from documents provided from the claims adjustment company not NRM. Moreover, the plaintiff's claims agreement is not part of plaintiff's exhibit 9a and therefore is not even arguably copyrighted. As such, there is no copyright violation.

Plaintiffs contend that even if the documents presently used by the defendants are not copies of NRM documents, the documents originally taken to Aliquippa by Rakoff had to be copies because the defendants had not yet involved Barbara Freedman to write the trust agreement. Dennis Ryan, however, testified that he gave Bramwell trust agreements from which Bramwell could create a trust document that it could present to Aliquippa. Although Oakley testified that he actually read through the trust documents presented to Winarski by Rakoff on July 17, 1992, his testimony in this area is without credibility. Oakley testified as follows:

Mr. Winarski informed me that Mr. Rakoff had been in his office and presented him with the following contracts. With that he picked up a pile of contracts off his desk and handed them to me. I looked at those contracts, ... And the contracts that were presented were a duplication of our contracts, as far as I was concerned, verbatim. I could quickly identify that they were our contracts with the name A.V. Consulting put in place where National Risk Management would be.

(N.T. 2/9/93 at 189.).

Mr. Winarski, a witness for the plaintiff, however, testified that he never handed the documents to Oakley, but that they remained on the desk the whole time Oakley and his associates were there. Winarski disposed of his copy of the documents as did the defendants. There is no way for this court to actually determine whether the documents, as commercial documents, were so substantially similar as to conclude that they had been copied. The evidence is that the documents were prepared from drafts given to Bramwell by Ryan. I place slightly more credence in this testimony than in the testimony of Oakley on this particular issue.

### B. *Breach of Contract:*

Plaintiffs claim that defendants have written contracts of employment and that defendants have breached the provisions of those contracts relating to non-competition and nondisclosure of proprietary information.

Defendants deny that they entered into written contracts as alleged by plaintiffs. Plaintiffs have not produced copies of the alleged contracts and, in fact, seek to blame the defendants for the alleged "disappearance" of the contracts.

■ The requirements for a valid restrictive covenant in Pennsylvania are as follows:

The covenant must relate to ... a contract of employment (ancillary to an employment contract); (2) the covenant must be supported by adequate consideration; (3) the covenant must be reasonably limited in time and geographic territory; and, (4) the covenant must be necessary to protect the employer. (citations omitted)

*Gagliardi Bros., Inc. v. Caputo,* 538 F.Supp. 525, 527 (E.D.Pa.1982).

■ I have concluded that the defendants were not parties to an employment contract. Even if the defendants were under written contracts, as alleged by plaintiffs, the covenants would not be valid. In each defendant's case, the contract draft with the covenants was presented to the employee *after* he had agreed to the terms of his employment and after he had reported to work. Thus, there would have been no consideration to support the proposed restraints. *George W. Kistler, Inc. v. O'Brien,* 464 Pa. 475, 347 A.2d 311, 314 (1975). Plaintiffs argue that if the court determines that the contracts were signed subsequent to the commencement of defendants' employ, their continued employment would serve as valid consideration since they were employees at will. The Pennsylvania Supreme court, However, has rejected this contention in stating that the "continuation of the employment relationship at the time the written contract was signed ... [is] not sufficient consideration for the covenant despite the fact that the employment relationship was terminable at will by either party." *Id.* 347 A.2d at 316. *See also, Gagliardi,* 538 F.Supp. at 528.

When the restrictive covenant is contained in the initial contract of employment, consideration is the job itself. When the restrictive covenant is added to an existing employment relationship, however, it is only enforceable when the employee receives a corresponding benefit or change in status. An employee's continued employment is not sufficient consideration for a covenant not to compete which the employee signed after the inception of his employment, where the employer makes no promise of continued employment for a definite term.

*Maintenance Specialties, Inc. v. Gottus,* 314 A.2d 279, 282 (1974).

It is, therefore, clear that defendants Bramwell and Rakoff have not violated any contractual agreement with respect to any restrictive covenant. It is equally clear that defendants CBSC and A.V. did not interfere with any employment contract between the individual defendants and plaintiff corporations. It does not, however, necessarily follow that the defendants, Rakoff and Bramwell are not liable for some other violation. These separate issues will be addressed *infra.*

### C. Trade Secrets:

■ "The concept of a trade secret is at best a nebulous one and has been variously defined by case and text authority." *Van Products Company v. General Welding and Fabricating Company,* 213 A.2d 769, 775 (1965). A court sitting in equity will protect an employer from the unlicensed use of his trade secrets by an ex-employee provided the employee entered into an enforceable covenant so restricting his use or was bound to secrecy by virtue of a confidential relationship existing between the employer and his employee. *Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273, 276 (1976); *Wexler v. Greenberg,* 399 Pa. 569, 160 A.2d 430 (1960). Where, however, an employer has no legally protectable trade secret, an employee's "aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use these powers remains his property unless curtailed through some restrictive covenant entered into with the employer." *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 38 A.2d 33, 34 (1944). To be entitled to equitable relief, the burden is on the employer to show: (1) that the information constitutes a trade secret; (2) that it was of value to the employer and important in the conduct of his business; and (3) that by reason of discovery or ownership the employer has the right to the use and enjoyment of the secret; and (4) that the

secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. (citations omitted) *S I Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1255 (3rd Cir.1985).

 A trade secret is defined in part in the *Restatement (Second) of Torts* § 757, Comment b at 5 as:

> [A]ny formula, pattern, device or compilation of information which is used in one's business, and gives him an opportunity to obtain an advantage over competition who do not know or use it.

*Felmlee v. Lockett,* 351 A.2d at 277. Moreover, trade secrets must be just that; secrets. They must be particular secrets of the complaining employer and not general secrets of the trade in which he is engaged. *Id.* In fact, comment b to § 797 of the Restatement Second of Torts states:

> The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which are marketed cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business knows it. He may, without losing his protection, communicate it to employees involved in its use.... Nevertheless, a substantial element of secrecy must exist, so that, except by use of improper means, there would be difficulty in acquiring the information.

"The trust and confidence upon which legal relief is predicated stems from the instance of the employer's *turning over to the employee* the pre-existing trade secret. It is then that a pledge of secrecy is impliedly extracted from the employee, a pledge which carries with him even beyond the ties of his employment relationship." *Wexler,* 160 A.2d at 434.

As the court in *Wexler* noted,

> Any form of post-employment restraint reduces the economic mobility of employees and limits their personal freedom to pursue a preferred course of livelihood. The employee's bargaining position is weakened because he is potentially shackled by the acquisition of alleged trade secrets; and thus, paradoxically, he is restrained, because of his increased expertise, from advancing further in the industry in which he is most productive. Moreover, as previously mentioned, society suffers because competition is diminished by slackening the dissemination of ideas, processes and methods.

*Wexler,* 160 A.2d at 435.

In balancing the protections afforded to the employer against those afforded to the employee, courts have weighed the latter more heavily.

 Some factors to be considered in determining whether information is a trade secret are: (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *SI Handling,* 753 F.2d at 1256; *BIEC Int'l Inc. v. Global Steel Services, Ltd.,* 791 F.Supp. 489 (E.D.Pa.1992).

 Under Pennsylvania law, confidential customer lists have been held to be trade secrets. *SI Handling,* 753 F.2d at 1258. The Pennsylvania Supreme Court has stated that:

> In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represents a material investment of employer's time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be prop-

erty in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a nondisclosure contract, either under the law of agency, or under the law of unfair trade practices. Whether this information was embodied in written lists or committed to memory is, we believe, of no significance; in either case the data are entitled to protection.

*Morgan's Home Equipment Corp. v. Martucci,* 136 A.2d 838, 482–43 (1957). Similar protection has been extended to certain business and marketing information including the costing and pricing information of an employer's business plans, marketing strategies, and financial projections, and the terms of specific customer accounts including contract expiration dates and revenues. *BIEC,* 791 F.Supp. at 545. Customer lists and confidential business information, however, cannot be trade secrets if they are easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder. Therefore, some courts have denied protection to customer lists which are easily generated from trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a potential customer for a given product. *Id.* The secrecy in which a purported trade secret is kept need not be absolute but reasonable precautions under the circumstances must be taken to prevent disclosures to unauthorized third parties. The degree of secrecy must be such that it would be difficult for others to obtain the information without using improper means.

 On the other hand, the Third Circuit has expressly held that an employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secrets. *SI Handling,* 753 F.2d at 1258.

It is not a phenomenal thing in American business life to see an employee, after a long period of service, leave his employment and start a business of his own or in association with others. And it is inevitable in such a situation, where the former employee has dealt with customers on a personal basis that some of those custom-

ers will want to continue to deal with him in his new association. This is so natural, logical and part of human fellowship, that an employer who fears this kind of competition must protect himself by a preventive contract with his employee....

*Spring Steels v. Molloy,* 400 Pa. 354, 162 A.2d 370, 375 (1960). In the instant case, there has been a great deal of debate concerning whether the client list published in plaintiffs' proposal book is an all inclusive list or merely a partial reference list. The answer to that question is of little importance to the court. The clients sought by either the plaintiffs or the defendants are a finite number. Both are seeking non-profit organizations. Any one is able to obtain, from the Commonwealth, a list of all companies registered as non-profit within the state. As such, the potential pool of clients is a matter of public knowledge and therefore is not a trade secret.

 "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 422 (E.D.Pa.1980) (quoting *Imperial Chemical Industries, Ltd. v. National Distillers and Chemical Corp.,* 342 F.2d 737, 742 (2d Cir. 1965).

The owner of a trade secret, unlike the owner of a patent, does not have a monopoly over the process or formula. He is only protected from other persons' gaining access to it either by stealing it directly from him, or having another to whom it was lawfully disclosed do so. Others in the field are free to arrive at precisely the same method and to use the method so long as they obtain their knowledge through their own independent efforts.

*Continental Data Systems, Inc. v. Exxon Corp.,* 638 F.Supp. 432, 442 (E.D.Pa.1986), (quoting *Greenberg v. Croydon Plastics,* 378 F.Supp. 806, 812 (E.D.Pa.1974)).

The fact that individual forms in marketing material or in plaintiff's proposal book were compilations of public information does not

itself preclude a finding that the combination of the included elements affords a plaintiff a competitive advantage and is not itself in the public domain. *Continental*, 638 F.Supp. at 443. The combination of information in the proposal book reflected market research preformed by plaintiff and decisions to include and exclude certain elements from a larger pool of data. It is this, rather than the data contained in the individual forms generally known in the self insurance business, which may arguably contain a sufficient degree of novelty, however, slight, to be excluded from general knowledge, and may qualify the proposal book as a trade secret.

■■■ "A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue." *Air Products and Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 442 A.2d 1114, 1123 (1982), (quoting *Allis–Chalmers Mfg Co. v. Continental Aviation & Eng. Corp.*, 255 F.Supp. 645, 654 (E.D.Mich.1966)).

■■■ The plaintiff contends that a number of trade secrets were conveyed to Bramwell and Rakoff and then disclosed to others. The plaintiff, however, was hard pressed to identify the secrets for which it sought protection. After much discussion, plaintiff vaguely identified a couple of alleged trade secrets. Plaintiff contends that its pricing is a trade secret. That is, Oakley testified at trial that in order to market the program he and Wilson had to come up with a financial incentive to give clients. The two concluded that a 25% difference between what a client paid for yearly premiums and what he would pay under the self funding system would be a marketable incentive. The 25% reduction figure was an arbitrary number chosen by Wilson and Oakley. Wilson and Oakley, however, still had to justify the number to be sure that they could in fact deliver what they would be selling. To this end the two hired an accounting firm to confirm that the program could be funded at 25% below a client's present annual premium amount.

Plaintiff contends that although the clients are told of the 25% discount and why it works, they are not told how NRM actually came up with the figure. From what was presented to me and argued at trial, I understand that plaintiff seeks protection for this secret. I see no reason why such information should be given protection as a trade secret. How Wilson and Oakley first determined the arbitrary 25% number is of no value to them. It, likewise would be of no concern for a competitor. Now, As a competitor one might be very interested in finding out how they can support such a number, i.e. one would like to see the accounting documents that support such a representation. But this information is freely given out to prospective clients. It is, therefore clear that the information about the 25% figure, which plaintiff seeks to protect is not a trade secret. Moreover, the evidence indicates that the clients that CRS already has, are not necessarily funded at the 25% discount rate. Instead, CRS makes a determination as to what type of savings each client should receive on an individual basis. For example, one CRS client's trust is funded at more than the 75% amount that NRM would set in place because CRS determined that the financial status of the client required it to make a larger payment than would be expected under the NRM plan.

Plaintiff also contends that the use of uncollateralized bonds by CRS is a trade secret violation. What plaintiff fails to recognize, however, is that while these bonds are difficult to obtain they are, nevertheless, available in the industry. There is nothing about the uncollateralized bond that could justifiably be considered as a trade secret.

What we have in this case is a company that has for the better part of a decade taken advantage of the various statutory procedures and mechanisms available at both the state and federal levels and created a valuable trust program which it is able to service and sell to non-profit corporations. Its use of the statutory mechanisms, however, does not give rise to a trade secret. NRM has failed to guard its methods with sufficient secrecy to retain any secrets that are at issue in this case. It freely distributes its proposal book, which explains its method in a general overview. Its proposal book contains numerous documents which aid in the servicing of

the client. The method is also explained to potential clients in a slide show as well as in sales presentations. The information which NRM seeks to protect simply has not been properly secreted and any trade secret status that may have once attached is no longer present.

Plaintiffs acknowledge that they do not have an exclusive right to such things as trust agreements, administration agreements, claims agreements or uncollateralized bonds. Plaintiffs, however, contend that they are seeking not to protect the "pieces" of the puzzle, but rather, the "method" for putting the pieces together into a cohesive picture. It is this "method," however, that is disclosed to potential clients in plaintiffs' proposal book and explained to clients when plaintiff makes a presentation.

Accordingly, judgment will be entered against the plaintiffs and in favor of all defendants on Count I.

To the extent that the defendants have not disclosed any trade secrets they have likewise not breached any fiduciary duty. As plaintiffs conceded during closings the breach of fiduciary duty issue was based on the alleged disclosure of trade secrets.

### D. Tortious interference with Contract:

Pennsylvania Courts have adopted the *Restatement (Second) of Torts* definition of intentional interference with existing contractual relations. *Adler, Barish, Daniels, Levin & Cresskoff v. Epstein*, 393 A.2d 1175 (1978), *cert. denied and appeal dismissed*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979).

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from failure of the third person to perform the contract.

*Restatement (Second) of Torts* § 766.

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing

the other from performing the contract or causing his performance to be more *expensive or burdensome*, is subject to liability to the other for the pecuniary loss resulting to him.

*Restatement (Second) of Torts* § 766A.

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm from loss of the benefits of the relation, whether the interference consists of:
>
> (a) inducing or otherwise causing a third person not to enter into or continue a prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

*Restatement (Second) of Torts* § 766B.

■ The evidence is clear that defendants Bramwell and Rakoff intentionally interfered with the prospective contractual arrangement between NRM, Inc and Aliquippa Hospital. Their actions caused plaintiffs additional expenses and inconvenience. Rakoff's attempt to solicit such business was even more wanton and outrageous considering that he was still employed by NRM. Bramwell's actions, while outrageous, were not as egregious due in part to the fact that Bramwell was no longer employed by NRM when Aliquippa was solicited for business.

Both of the defendants, however, are liable to NRM for their Actions. I conclude that the two defendants should be severely sanctioned for their outrageous conduct. Rakoff shall be ordered to pay plaintiffs the sum of $15,000.00 for intentionally interfering with the prospective contractual relationship between NRM and Aliquippa Hospital while he was still employed by NRM. Bramwell, who no longer worked for NRM at the time of the Aliquippa incident, but who was well aware of the nature of his acts and the interfering he was doing shall be ordered to pay $10,000.00 to the plaintiffs.

The corporate defendants are not liable for any tortious interference with contract. CBSC did not interfere with a contractual relationship between plaintiffs and defendants Bramwell and Rakoff for the simple

reason that there was no contract with which to interfere. Moreover, the evidence of any wrongdoing in this case against CBSC is minimal. Likewise, I am unconvinced that either CRS or A.V. Consultants intentionally interfered with the contractual relationship between Aliquippa and NRM. CRS as a corporation was not in existence at the time Rakoff went to Aliquippa and therefore has no liability with respect to any interference.

■■■■ A.V. Consultants is also not liable for the actions taken by Bramwell, Rakoff and Ryan in this case, even though Ryan was President of A.V. A corporation is a creature of legal fiction, and must "act" through its officers, directors and agents. *Lokay v. Lehigh Valley Co-op. Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405, 408 (1985) (citing *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637 (1978)). A corporation is bound by its agent's acts, if those acts were performed with the agents implied or apparent scope of authority, unless the agent acted for his own benefit without the corporation's ratification of his actions. *Lokay*, 492 A.2d at 409. There is no evidence that A.V. ever gave Ryan any authority to bind the corporation to a contract involving a workman compensation program. A.V. does not even have a license to provide such a program. Nor was Ryan actions ever ratified by the corporation.

■■■ The concept of implied or apparent authority is premised on equitable concerns. A finding of apparent authority binds a corporation for the actions of its agents when a third party has relied on the authority or position of the agent in entering into a contractual relationship. Such equitable considerations are absent in the case at bar. Bramwell and Rakoff, who were dealing with Ryan, knew that Ryan had no authority to use the A.V. letter head to bind that corporation to any workman compensation contract. In fact, it was their intention to hold the "soon to be created" CRS corporation, not A.V., responsible for any contract that was signed by Aliquippa. Moreover, it cannot be said that Aliquippa relied on Ryan's apparent authority because Ryan was not involved with any contract talks between Aliquippa. Nor was there any contract that was consum-

mated on which Aliquippa could complain that it has relied to its detriment.

While Ryan's action may have contributed to the contractual interference perpetrated by Bramwell and Rakoff, there is insufficient evidence to establish that Ryan was aware of the fact that Aliquippa had already signed contracts with NRM. As such, there was no *intention* to interfere with any contractual obligations that may have already existed. Moreover, the mere attempt to beat a competitor to a prospective client is not actionable. As far as Ryan knew, he was merely engaging in honest American competition.

### E. *Bramwell and Rakoff's Counterclaims:*

Finally, there is the issue of Bramwell and Rakoff's counterclaim, which asserts a claim against NRM, Inc. for unpaid wages. Defendants have attempted to convince the court that although there was no contract of employment, there was an oral contract that the sum of $2,000 would be earned by an employee every time he completed four goals established by the company. The evidence, at trial, however, demonstrated that the $2,000 "award" was added to the total overall salary of the individual and paid out equally over the course of the employees next 12 months of pay. As such, completion of the four goals merely increased the salary of the employee but did not automatically obligate the employer to pay an immediate $2,000 to the employee. An employee was only entitled to such salary as long as he was employed by the company.

I therefore conclude that any obligation to pay defendants for their accomplished goals ceased when the employment relationship was terminated.

### III. Conclusion:

No defendant has engaged in either copyright infringement or trade secret violations. Neither Bramwell nor Rakoff breached an employment agreement as none existed. As such, no other defendant interfered with any contractual relationship between NRM and Bramwell or Rakoff. Rakoff, Bramwell and Ryan are, however, liable for tortious interference with the prospective contractual ar-

rangement between NRM and Aliquippa. These tortious actions were taken on behalf of the individual defendants and not on behalf of any then existing corporation.

Plaintiffs' request for injunctive relief will be denied.

An appropriate order follows.

## ORDER

AND NOW, this 31st day of March, 1993, consistent with the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED that JUDGMENT is entered in favor of all defendants and against the plaintiffs on all Counts of the Amended Complaint except Count VI.

It is FURTHER ORDERED that JUDGMENT is entered in favor of plaintiffs and against defendants David G. Bramwell and Martin D. Rakoff on Count VI, jointly and severally in the amount of $1,696.00.

It is FURTHER ORDERED that Martin D. Rakoff pay the sum of $15,000 to the plaintiffs as punitive damages.

It is FURTHER ORDERED that David G. Bramwell pay the sum of $10,000.00 to plaintiffs as punitive damages.

It is FURTHER ORDERED that plaintiffs' request for injunctive relief is DENIED.

AND IT IS SO ORDERED.