**Jim PARSONS, Jan Murphy, and Martha Raffaele, Petitioners**

v.

**PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2006.

Decided Nov. 15, 2006.

---

Craig J. Staudenmaier, Harrisburg, for petitioners.

William H. Lamb, West Chester, for respondent.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge SMITH–RIBNER.

This matter presents issues of first impression. Jim Parsons, an investigative reporter for WTAE–TV, Jan Murphy, the Capitol Bureau Chief for The Patriot–News newspaper in Harrisburg, and Martha Raffaele, a reporter in the Harrisburg Bureau for the Associated Press (together, Reporters), petition for review of the "Final Decision" of the Pennsylvania Higher Education Assistance Agency (PHEAA) that largely denied requests for access to information that the Reporters submitted to PHEAA pursuant to the Act known as the Right–to–Know Law, Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §§ 66.1–66.9.

The Reporters raise several questions for review. They are whether the Final Decision rendered by PHEAA was not supported by substantial evidence; whether PHEAA erred by determining that the records requested are not public records subject to disclosure under the Right–to–Know Law because they are "trade secrets" under the Uniform Trade Secrets Act (Trade Secrets Act), 12 Pa.C.S. §§ 5301–5308; whether PHEAA erred by determining that the records are not public records because they represent "legislative acts" protected from disclosure; whether PHEAA erred in determining that the requested records are exempt from disclosure as they contain personal information protected by a right to privacy; and whether the Reporters are entitled to reasonable attorney's fees due to PHEAA's willful disregard of the public's right to know and lack of a reasonable legal basis. PHEAA asserts that the Reporters improperly rely on a hearing examiner's report.

I

Section 1 of the Right–to–Know Law, 65 P.S. § 66.1, defines "public record" subject to disclosure under the act to include "[a]ny account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons...." Exceptions are stated for material that would disclose the existence of an investigation, records "access to or the publication of which is prohibited, restrict-

ed or forbidden by statute law or order or decree of *court*" or "which would operate to the prejudice or impairment of a person's reputation or personal security" or which would result in a loss of federal funds. Section 2(a), 65 P.S. § 66.2(a), provides in part: "[A] public record shall be accessible for inspection and duplication by a requester in accordance with. this act."

On July 22, 2005, Parsons submitted a request to PHEAA to make available for review various categories of documents including "a. all vouchers (including supporting receipts and documentation) for travel by PHEAA employees and Board members for 2003, 2004 and 2005 to the present [including but not limited to] travel for seminars, conferences, training and college fairs[;] ... c. all PHEAA credit card bills for incidental expensesfor [sic] 2004 and 2005 to the present; ... [and] g. most recent performance and financial audits conducted on PHEAA." Requesters' Ex. 16; Reproduced Record (R.R.) 1a.[1]

PHEAA sent letters to Murphy and Raffaele on September 6, 2005 denying all of their requests: the letter to Raffaele stated that Board member receipts represent legislative activities, that some of the records requested included trade secrets and that some contained personal or pri-

vate information that could prejudice or impair one's reputation or security; the letter to Parsons denied his requests to the extent that they fell within the same objections. The letters also stated that PHEAA was filing a declaratory judgment action in this Court naming the Reporters as respondents (No. 455 M.D. 2005). The Reporters filed a petition for review seeking relief in the Court's original and appellate jurisdiction (No. 501 M.D.2005). Pursuant to a stipulation, PHEAA discontinued its action and the parties agreed to participate in a hearing. By order of this Court, PHEAA was authorized to appoint former Senior Judge Warren G. Morgan as a Hearing Examiner.[2]

## II

The Hearing Examiner conducted a hearing on April 4, 2006, at which the Reporters testified on their own behalf and Richard E. Wiley, President and Chief Executive Officer of PHEAA, testified on its behalf. The Hearing Examiner issued an Examiner's Report on May 22, 2006, summarizing the testimony and making findings of fact, discussing the objections raised by PHEAA and making recommendations.[3] He found that PHEAA is a gov-

---

1. On August 1, 2005, Murphy submitted a request to examine and inspect "[r]eceipts for all expenses that PHEAA incurred on the board retreat to Nemacolin Woodlands Resort on June 1–3, 2005" and receipts for expenses for seven other retreats back to April 2000. Requesters' Ex. 6; R.R. 2a. On August 15 Raffaele submitted a request for "access to all vouchers, bills and receipts submitted to PHEAA concerning expenses paid by the agency for the board's business development conference held from June 1–3 at Nemacolin Woodlands" including "receipts for lodging, dining, travel and all other expenses paid by PHEAA for all conference participants and their guests". and access to "the conference agenda and any minutes, orders, decisions or other records of any official business conduct-

ed by the board." Requesters' Ex. 13; R.R. 4a.

2. *See* Section 3.5(b) of the Right–to–Know Law, added by Section 4 of the Act of June 29, 2002, P.L. 663, 65 P.S. § 66.3–5(b): "Prior to issuing the final determination regarding the exceptions, the agency head or his designee may conduct a hearing." At the hearing Parsons agreed to limit his request to the items quoted above, and to financial audits.

3. PHEAA asserts that the Reporters' references to and reliance upon the Hearing Examiner's observations and recommendations are improper and unlawful. It states first that the Hearing Examiner's Report is not

ernmental agency created by the Act of August 7, 1963, P.L. 549, *as amended,* 24 P.S. §§ 5101–5112, for the purpose of improving higher education opportunities for Pennsylvanians and that it is a Commonwealth agency subject to the Right–to–Know Law. It is governed by a Board of Directors made up of the Secretary of Education, three members appointed by the Governor, four Republican and four Democratic Senators appointed by the President Pro Tempore of the Senate and four Republican and four Democratic Representatives appointed by the Speaker of the House. Board members are not paid for their service but are reimbursed for expenses. PHEAA allocates money appropriated by the General Assembly for student aid, but it also has become a significant actor in the financial services industry relating to student loans. It purchases loans, services loans, guarantees loans and sells and leases computer services, competing for such business in the national marketplace. All of PHEAA's expenses are paid from money that it earns, not from appropriations. PHEAA uses its retreats, attended by Board members, employees, clients and customers, to promote its business, and it pays all of the expenses for food, lodging and so forth. No official action is taken at retreats and no minutes are kept.

Regarding other travel, PHEAA has at least 200 employees traveling on various assignments each month. The Parsons travel voucher request would number 30,-000 pages of documents. At the hearing PHEAA agreed to release two financial audits that have been made public and to give access to purchasing documents subject to a right to redact. Although more than nine months had elapsed since Parsons' request, Wiley testified that the requested documents had not been examined; no document, even with redactions,

---

properly before the Court and should be stricken or disregarded. Materials that are not part of the certified record are not before the Court and cannot be placed before the Court by attachment to a brief or reproduced record. *Hamm v. Unemployment Compensation Board of Review,* 77 Pa.Cmwlth. 218, 465 A.2d 716 (1983). Section 4(d) of the Right–to–Know Law, 65 P.S. § 66.4(d), provides that the record before a court on appeal from a final agency determination denying access "shall consist of the request, the agency's response, the requester's exceptions, if applicable, the hearing transcript, if any, and the agency's final determination, if applicable." This specification does not include the Hearing Examiner's Report, and PHEAA maintains that it properly did not include that in the certified record. The Reporters in a Reply Brief state that under Pa. R.A.P.1951(a) the record shall consist of the order or determination of the government unit, the findings or report on which such order or determination is based and the pleadings, evidence and proceedings before the government unit. The procedure that was followed is related to No. 501 M.D.2005, where an order was entered providing for hearing.by a Hearing Examiner and the issuance of a report. In the circumstances of this case, where declaratory judgment actions complicated the ordinary Right–to–Know Law appeal process and the Court sought to restore order by encouraging a hearing and providing for a report, the Court concludes that the Hearing Examiner's Report is properly part of the record.

PHEAA argues also that the agency head is the finder of fact in a Right–to–Know Law case and that it was not bound by the findings and conclusions of the Hearing Examiner's Report. It notes that a hearing is not mandatory before a final determination under Section 3.5(b) of the Right–to–Know Law, which provides that an agency head or his or her designee "may" conduct a hearing before issuing the final determination. In their Reply Brief the Reporters agree that the Hearing Examiner's findings and conclusions were not binding, but they respond that PHEAA's failure even to consider them demonstrates its disregard of the evidence developed on the record at the hearing. The parties are correct that the agency head was not bound by the findings and conclusions of the Hearing Examiner.

had been turned over to any Reporter. The Hearing Examiner found that PHEAA had not made a good-faith effort to examine its records that were potentially responsive and that it was uncertain as to what exempt information, if any, was contained in them. He rejected the contentions that the acts of legislator Board members were legislative acts not subject to disclosure. Further, he concluded that the Trade Secrets Act is remedial, not prohibitory, and, in any event, that PHEAA had not proved the existence of trade secrets. In addition, PHEAA had not shown that those attending its retreats had any subjective expectation that their identities would be kept confidential. The Hearing Examiner recommended that the requests be granted, with some documents subject to redaction as stipulated at the hearing.

Wiley issued the Final Decision of PHEAA on June 7, 2006. Without reference to the Hearing Examiner's Report, Wiley explained that the purposes of Board retreats are to permit a thorough review of operations without outside distractions, to invite some customers so as to thank them for their business and to strengthen business relationships with PHEAA Board members and employees and to exchange information with customers about the current student loan environment. He described PHEAA as being different from other agencies in that it competes in the private sector and receives no funding for its operations from the General Assembly. It is frequently audited, including by federal regulators and by private-sector lenders for whom it manages billions of dollars in assets. It competes with hundreds of private sector lenders, and in the 2005–2006 academic year it provided $170 million dollars from earnings to fund programs for students. To foster necessary trust, PHEAA requires potential clients and business partners to sign confidentiality agreements, and PHEAA maintains high security standards.

Noting that Pennsylvania adopted the Trade Secrets Act in 2004, Wiley quoted the definition of "trade secret" in 12 Pa. C.S. § 5302, which states:

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Wiley stated that compilations of information are protected from disclosure when, taken in the aggregate, the information is not generally known, even if discrete pieces are known, citing *National Risk Mgmt., Inc. v. Bramwell*, 819 F.Supp. 417 (E.D.Pa.1993). He acknowledged *Envirotest Partners v. Department of Transportation*, 664 A.2d 208 (Pa.Cmwlth.1995), in which this Court held that a contract by a private entity to provide centralized automobile emissions testing services was a public record subject to disclosure, despite a claim that disclosure would reveal trade secrets, but he stressed that the court held that the contract was not within the exception for prohibition by "statute law or order or decree of court." He concluded that the Trade Secrets Act now provides such a prohibition.

Wiley indicated that PHEAA's organic legislation recognizes sensitive information. In 24 P.S. § 5104(1.1)(iii) the act expressly exempts contracts relating to servicing of student loans from the Right–

to–Know Law. Wiley asserted that disclosure of trade secrets to a competitor such as Sallie Mae would likely cause PHEAA to lose competitive advantage and would permit a competitor to see where PHEAA is concentrating marketing efforts. He stated that trade secrets pervade the requested documents, revealing business initiatives, customers called upon, purposes of marketing calls, sales and marketing methods, geographic marketing efforts and product development.

On the issue of whether any requested records were exempt because they related to legislative activities, Wiley cited the Supreme Court's decision in *Uniontown Newspapers, Inc. v. Roberts*, 576 Pa. 231, 839 A.2d 185 (2003), where a reporter sought access to a legislator's telephone records. The Court held that any common law right of access was supplanted by the Right–to–Know Law but that the act did not include members of the General Assembly in the definition of "agency." Wiley asserted that sixteen legislators control the Board of PHEAA acting as agents of the General Assembly. Further, Wiley stated that the legislator Board members "represent their party's caucus, and when they act officially on behalf of PHEAA, they act in their legislative capacities" and that those members "are acting as an arm of the General Assembly" when they engage in PHEAA activities. Final Decision, p. 18.

Finally, Wiley addressed the privacy exception, citing *Rowland v. Public School Employees' Retirement System*, 885 A.2d 621 (Pa.Cmwlth.2005), *appeal denied*, 587 Pa. 703, 897 A.2d 462 (2006) (holding right to privacy not outweighed by any public benefit of disclosure of personal information of retirees). In *Tribune–Review Publ'g Co. v. Bodack*, 875 A.2d 402 (Pa. Cmwlth.2005), the Court determined that private citizens had a legitimate expectation that their names and telephone numbers would remain private when they called a council member; they did not consent to disclosure, which possibly could impair their reputations or security, and that concern outweighed any public benefit.[4]

### III

■ The Reporters first advance a contention that the Final Decision is not supported by substantial evidence. They stress that it does not contain a single citation to the hearing transcript and does not refer in any way to the Hearing Examiner's findings and Report. The Reporters argue that the Final Decision recites and relies upon facts not revealed at the hearing. They do not credit the assertion that a thorough review had been made of all the documents requested, after Wiley testified to the contrary. Statements such as the averment on p. 4 of the Final Decision that the review revealed "information regarding highly confidential discussions regarding strategic alignments and relationships" are not supported by any evidence. Similarly, there was no evidence presented at the hearing that the requested vouchers were legislative records or that they would threaten personal security. Although Wiley was not bound by the Hearing Examiner's findings, PHEAA's failure to refer to

4. The Court has conducted its appellate review for whether constitutional rights have been violated, whether an error of law has been committed and whether the necessary findings of fact are supported by substantial evidence in the record. *Parsons v. Urban Redevelopment Authority of Pittsburgh*, 893 A.2d 164 (Pa.Cmwlth.2006). Substantial evidence has been defined as such evidence that a reasonable person would accept as adequate to support a conclusion. *William Penn School District v. Department of Education, Division of Food and Nutrition*, 902 A.2d 583 (Pa.Cmwlth.2006).

the hearing transcript and its inclusion in the Final Decision of factual assertions not derived from evidence presented at the hearing does undercut evidentiary support for its decision.

■ The Reporters contend that PHEAA erred in concluding that the requested records are protected from disclosure by a statutory exception for trade secrets. They emphasize that the Trade Secrets Act is not an actual prohibition on release of information such as was involved in *McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888 (1973), where a statute affirmatively prohibited release of names of recipients of public assistance. They note that in *Hoffman v. Pennsylvania Game Commission*, 71 Pa.Cmwlth. 99, 455 A.2d 731 (1983), the Court held that there was no exception for a claimed "trade secret" in the list of subscribers to a state game magazine, and in *Envirotest Partners* the Court declined to protect claimed trade secrets in a private entity's contract with the state.

■■ The Reporters quote the definition of "trade secret" in 12 Pa.C.S. § 5302, *see above*, and they argue that it fits only the competitive, proprietary business context. As the Hearing Examiner reasoned, however, the fact that PHEAA is engaged also in profitable business activities does not change the fact that it is a public corporation and a government instrumentality and that its earnings are public moneys about which the public has a right to know. They argue that the vouchers or accounts of expenditures for the Board retreats do not reflect any competitive information. Wiley stated that a voucher for travel for an employee to make an ordinary visit with a known customer would "[p]robably not" reveal a trade secret. N.T.

180; R.R. 73a. Factors relevant to determining if information is a trade secret are the extent to which it is known outside the owner's business; extent to which it is known by employees and others within the owner's business; extent of measures taken to guard the secrecy; value of information to competitors; effort or money expended to develop the information; and ease or difficulty with which it could be properly acquired or duplicated. *Iron Age Corp. v. Dvorak*, 880 A.2d 657 (Pa.Super.2005). It must be an actual secret of peculiar importance to the business and constitute competitive value to the owner. *Id.* The information that PHEAA seeks to protect, including "how we are entertaining" partners, N.T. 133; R.R. 62a, is not such a secret.

PHEAA did assert (without providing examples at the hearing) that the statement of purpose on a voucher might include secret information such as a purpose to talk to a lender about a new line of business or technology, although any such statements could be redacted under Section 3.2 of the Right–to–Know Law, added by Section 4 of the Act of June 29, 2002, P.L. 663, 65 P.S. § 65.3–2, and the balance disclosed. The Reporters maintain that the Trade Secrets Act codified existing law (12 Pa.C.S. § 5308 states that it displaces conflicting tort, restitutionary and other law providing civil remedies for misappropriation of a trade secret), and they refer to *Envirotest Partners*, which held that trade secrets were not protected, citing *Ryan v. Pennsylvania Higher Education Assistance Agency*, 68 Pa.Cmwlth. 123, 448 A.2d 669 (1982) (holding that requests for contracts for servicing student loans made before adoption of 24 P.S. § 5104(1.1)(iii) were proper requests for public records).[5]

---

5. Amicus Pennsylvania Newspaper Association states that PHEAA has made only unsubstantiated claims about competitive harm and offered no evidence that the release of the

PHEAA responds that travel expense vouchers and backup documentation, for instance, contain confidential information about its methods and strategies of business development, as well as customer lists. Wiley testified to the real and continuing threat of an attempted takeover by Sallie Mae, which would benefit from disclosure of PHEAA trade secrets. No court has addressed the Trade Secrets Act as an exception to the Right–to–Know Law. PHEAA argues that in *Envirotest Partners* this Court permitted access to trade secrets in a contract with the Department of Transportation only because at that time there was no "statutory law" prohibiting disclosure. From this it infers that the Court would have held the contract exempt if the Trade Secrets Act had existed. Similarly in *Hoffman*, although the Pennsylvania Game Commission asserted that its magazine subscriber list was a trade secret of a proprietary rather than governmental activity, the Court applied the Right–to–Know Law. PHEAA posits that the Reporters focus on the term "prohibited" to the exclusion of the term "restricted" in the exceptions for "records access to or the publication of which is prohibited, restricted or forbidden by statue law or order or decree of court."

As the parties agree, the requested vouchers for expenses for travel and for the retreats conducted by PHEAA facially fall squarely within the express language of the Right–to–Know Law defining "public records" as any "account, *voucher*, or contract *dealing with the* receipt or *disbursement of funds by an agency . . . .*" (Emphasis added.) The vast majority of the requested records are simply vouchers for expenses for travel or for retreats,

including transportation tickets, meal expenses, lodging and recreation. When asked if a bill would say that a PHEAA representative played eighteen holes of golf at a retreat with John Smith and discussed strategy to break the market in Missouri, Wiley responded: "There's nothing on the bill that would indicate that. But the whole purpose of being there was to talk about stuff like that." N.T. 152; R.R. 66a. Ultimately, Wiley asserted exemption from disclosure for essentially all expense records.

The Court determines that PHEAA failed to comply with its duty and responsibility under the Right–to–Know Law. The Right–to–Know Law favors public access regarding any expenditure of public funds. *Pennsylvania State University v. State Employees' Retirement Board*, 880 A.2d 757 (Pa.Cmwlth.2005), *appeal granted*, —— Pa. ——, 907 A.2d 1104 (2006). Wiley acknowledged that many of the vouchers and receipts would contain no competitive information at all. The Court rejects the contention that the Trade Secrets Act may serve as an exception to the Right–to–Know Law to exempt public records containing no trade secrets at all. Although it competes with private lenders and others PHEAA is subject to the Right–to–Know Law, *Ryan*, and it may not conduct its affairs precisely as a private entity does. The Court is not unmindful of the fact that some of the requested records may refer to secret information of competitive value. If so, the information may be redacted and the balance supplied under Section 3.2 of the Right–to–Know Law. The Court intends to retain jurisdiction over this matter, and should disputes arise over the extent of

requested records would reveal trade secrets. In addition, although the enabling statute expressly excludes a narrow category of records (contracts for servicing student loans) from

the reach of the Right–to–Know Law, that exclusion has nothing to do with the expense-related information currently being sought.

any redaction the Court shall provide for in camera examination or for the appointment of a master to review any redactions to determine their legitimacy.[6]

## IV

██ Another first-impression issue is the Reporters' contention that PHEAA erred in holding that expense vouchers were not public records within the meaning of the Right–to–Know Law because they are legislative records merely by virtue of the Board's being partially comprised of legislators. They note that full minutes of Board meetings are routinely provided upon request. N.T. 179–180; R.R. 73a. The Reporters dispute PHEAA's reliance upon *Uniontown Newspapers.* In that case a reporter and newspaper sought access to telephone records of a representative for which he sought reimbursement. The Supreme Court concluded that there is no common law right of access to legislative records and that the legislature was excluded from the definition of "agency" in the Right–to–Know Law. PHEAA decided that some of the requested documents were exempt from disclosure because "they relate directly to activities by legislators acting in legislative capacities," Final Decision, p. 17, and that "the legislative members on PHEAA's Board are acting as an arm of the General Assembly...." *Id.,* p. 18.

██ The Reporters argue that the law does not support these assertions and that interpretation of the Speech or Debate Clause of the State Constitution has been used to determine what activities are within the "legitimate legislative sphere" apart from actual speech and debate on the floor. Such activity must be "an integral part of

the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Uniontown Newspapers,* 576 Pa. at 248, 839 A.2d at 195 (quoting *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583, 602 (1972)). None of the requested records concern acts integral to the consideration of legislation. PHEAA disputes that this case requires analysis under the Speech or Debate Clause but rather requires analysis under the Right–to–Know Law and applicable case law as to whether the records relate to any type of legislative activity. It argues that legislator Board members exercise "legislative-type discretion" in functions such as appointing corporate officers, establishing the list of approved institutions and determining amounts to be awarded under grant programs. Lack of separate compensation supports this conclusion.

The Court rejects PHEAA's position that official records of the acts of legislator members of the Board are "legislative records." First, the PHEAA is an independent administrative agency defined by Section 1 of its organic legislation as "a body corporate and politic constituting a public corporation and government instrumentality...." 24 P.S. § 5101. There is no support in the law for the proposition that Board members act as "agents" for the legislature or that PHEAA acts as an "arm" of the legislature. As the Reporters in reply note, the court did analyze the scope of legislative activity in *Uniontown*

---

6. In view of the determination that no formal action is taken at PHEAA retreats, the Court concludes that the retreat agenda requested by Raffaele would not fall under the "minute, order or decision" prong of the definition of "public record" in Section 1 of the Right–to–Know Law.

*Newspapers* with reference to Speech or Debate Clause jurisprudence. Service on the Board of PHEAA is administration of a public corporation; it simply is not an integral part of the deliberative process of enacting legislation and related records are not "legislative."

## V

 The Reporters contend also that PHEAA erred in concluding that requested records are protected by the personal security or privacy exception. They have stated all along that they do not seek home addresses, home telephone numbers, Social Security numbers or private credit card or account numbers. Thus the only remaining item for which a privacy exception was claimed was the names of private citizens who met with PHEAA officials or attended retreats. The "personal security" exception in Section 1 of the Right–to–Know Law has been defined as "freedom from harm, danger, fear or anxiety[,]" *Pennsylvania State University*, 880 A.2d at 767 (quoting *Times Publ'g Co. v. Michel*, 159 Pa.Cmwlth. 398, 405, 633 A.2d 1233, 1236 (1993)). PHEAA offers only conclusory statements, without supporting proof, that some persons named in the requested records had a legitimate expectation that their identities would be kept secret.

PHEAA notes that the Court has recognized a privacy exception under the Right-to-know Law equivalent to the Constitutional right to privacy, which requires a weighing of privacy interests against the benefits of disclosure. *Sapp Roofing Co., Inc. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 12*, 552 Pa. 105, 713 A.2d 627 (1998). In *Bodack* the Court considered that cell phone records of a member of a city council fit within the personal security exception because disclosing the identities and telephone numbers of private citizens who called and were called

would violate a legitimate expectation of privacy and could impair their reputations or threaten their security. PHEAA asserts that several documents contain the names of private citizens who met with PHEAA officials or attended retreats who have not consented to disclosure and who had a reasonable expectation that their identities would be kept confidential. The Reporters reply that PHEAA retreats are not conducted in secret, nor was any evidence offered of any attendee's expectation of privacy or efforts to shield identities. No evidence was presented of harassment of attendees whose names were provided to Murphy.

The Court agrees that the retreats, as described in the record, cannot reasonably be defined as secret affairs. They are scheduled at highly visible public resorts, such as Nemacolin Woodlands, and they last several days with outdoor recreational activities often involved as well as meetings. The Court cannot accept that anyone attending such a function could entertain a legitimate expectation that his or her identity would not become known. As for other business meetings, other arrangements may apply. Should PHEAA believe that a meeting with a particular person was entirely confidential and be prepared to support that position, it may redact the name under Section 3.2 of the Right–to–Know Law.

## VI

 Finally, the Reporters state a claim for attorney's fees. Section 4.1 of the Right–to–Know Law, added by Section 6 of the Act of June 29, 2002, P.L. 663, provides that if a court reverses an agency's final determination the court may award reasonable attorney's fees and costs or a portion thereof if it finds that (1) the agency acted willfully or with wanton disregard in depriving the requester of access

or (2) the exemptions, exclusions or defenses asserted by the agency are not based on a reasonable interpretation of law. *See Parsons v. Urban Redevelopment Authority of Pittsburgh*, 893 A.2d 164 (Pa.Cmwlth.2006). The Reporters detail that Wiley admitted as late as the April 2006 hearing that no review of requested documents had been made. PHEAA produced no documents, even with redactions relating to the exceptions that it claimed, contrary to its duty under Section 3.2. The Court therefore agrees that the Reporters are entitled at least to a portion of their attorney's fees, but that amount shall be determined upon a final conclusion of this matter. Based upon its review in this case, the Court reverses the Final Decision of PHEAA, and it accordingly enters the following order.

Judges McGINLEY and COHN JUBELIRER dissent.

### ORDER

AND NOW, this 15th day of November, 2006, the Final Decision of the Pennsylvania Higher Education Assistance Agency (PHEAA) is reversed. PHEAA is ordered to provide Jim Parsons, Jan Murphy and Martha Raffaele access to items described in their written requests to the extent discussed in the foregoing opinion. PHEAA shall redact any private information contained in the requested records such as home addresses, home telephone numbers, Social Security numbers, private credit card or bank account numbers.

PHEAA may redact only limited information, such as reference to a product, which PHEAA is prepared to prove constitutes secret information that would be of competitive value to PHEAA. A record of such redactions shall be made available for inspection and review by the Court in the event of further proceedings. PHEAA shall supplement the certified record with the Hearing Examiner's Report.

Within thirty days of the entry of this order, the parties shall submit a joint status report describing the progress of the examination and inspection of records and detailing remaining areas of dispute. The Court retains jurisdiction.

CONCURRING and DISSENTING
OPINION BY President Judge COLINS.

I concur with the discussion contained in Sections I, II, III, and IV. However, I must dissent from the majority's scholarly opinion as stated in Sections V and VI.

I would redact the names of all individual recipients, as well as home addresses, home telephone numbers, social security numbers, and private credit cards or bank accounts.

I further disagree with the majority's resolution of the attorney's fees issue.