## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Terry Crouthamel, Jr., | : | |
| Petitioner | : | |
| | : | No. 295 C.D. 2018 |
| v. | : | |
| | : | Argued: December 11, 2018 |
| Department of Transportation, | : | |
| Respondent | : | |

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION BY
JUDGE McCULLOUGH                                        FILED:  April 5, 2019

Terry Crouthamel, Jr. (Requester) petitions for review of the February 21, 2018 Final Determination of the Office of Open Records (OOR) granting in part and denying in part his request for documents from the Department of Transportation (DOT) relating to a specific construction project pursuant to the Right-to-Know Law (RTKL).[1]

**Facts and Procedural History**

On November 6, 2017, Requester filed a request with DOT for the following information relative to Project 94465 in DOT's Engineering District 4:

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101-67.3104.

1. CS-4171 Certifications for all materials utilized for item 4489-2000 UTBWC,[2] including both the UTBWC hot mix and the UTBWC Polymer Emulsion.

2. Square Yards completed each shift for item 4489-2000.

3. Gallons of Polymer Modified Tack Coat used each shift for item 4489-2000.

4. Certified Payroll records for all work performed by the sub-contractor used for placement of item 4489-2000.

5. Mix Design for item 4489-2000.

(Final Determination at 2.) On November 14, 2017, DOT invoked a 30-day extension to respond pursuant to section 902 of the RTKL, 65 P.S. §67.902. *Id.* On December 11, 2017, DOT provided Requester with redacted payroll records responsive to Item 4 of his request, withholding employee names, Social Security numbers, and dependent information. *Id.* However, DOT denied the request as to Items 1, 2, 3, and 5 on the basis that the responsive records contain trade secrets and confidential proprietary information. *Id.*

Requester appealed to the OOR, which invited both parties to supplement the record and directed DOT to notify any third parties of their ability to participate in the appeal. *Id.* On January 4, 2018, DOT submitted a position statement alleging that, with respect to the payroll records, employee names and personal identification information are exempt from access under the RTKL, and that

---

[2] UTBWC appears to reference "Ultra-Thin Bonded Wearing Course," a specific type of asphalt application requested by DOT for this particular Project. *See* Reproduced Record (R.R.) at 77a.

the remainder of the requested information was exempt from access as trade secrets and confidential proprietary information. *Id.*; *see also* R.R. at 34a-38a.

DOT attached to this statement a sworn and notarized affidavit from Mike Bernetski, Civil Engineer Supervisor for DOT's Engineering District Office 4. (Final Determination at 2-3.) In this affidavit, Bernetski explained that the records responsive to Item 4 of the request were certified payroll records submitted by DOT's contractor, Glenn O. Hawbaker, Inc. (Hawbaker) and its subcontractor, Midland Asphalt Materials, Inc. (Midland), whose workers were nongovernmental employees. (R.R. at 40a.) Bernetski stated that he was informed by Midland that the responsive records to the remaining items of the request contained information classified as trade secrets and confidential proprietary information because they contained commercial and financial information which was privileged or confidential and, if disclosed, would cause substantial harm to its competitive position by allowing competitors to ascertain its business plans and strategies. *Id.* Bernetski noted that Midland advised that such records included information not subject to public access, such as its "proprietary mix formula for asphalt from which production quantities can be extracted and pricing information can be reverse engineered." *Id.* Additionally, Bernetski noted that the "production quantities utilized in a competitive construction market [are] proprietary by its very nature" and that disclosure of the requested records could be used by a competitor to reverse engineer bid information. (R.R. at 41a.)

On this same date, Midland submitted a request to participate in the appeal, which the OOR granted the next day, accompanied by a position statement and a sworn and notarized affidavit of its Senior Executive, William Coleman. (Final Determination at 3.) In its position statement, Midland alleged that DOT properly

redacted personal identification information from the certified payroll records and properly denied access to the remainder of the request because the information contained therein was confidential and proprietary. (R.R. at 44a-50a.)

In his affidavit, Coleman identified Midland as providing "construction materials and services to DOT's heavy and highway industry." (R.R. at 51a.) He noted that Midland "generally supplies asphalt products and specialized construction services to qualified heavy and highway contractors, including but not limited to [Hawbaker] for use and incorporation into [DOT] highway construction projects." *Id.* As part of its business practice, Coleman stated that Midland routinely submits quotes for materials and/or services to qualified general contractors in competitive bidding processes throughout the United States. *Id.* He described Project 94465 as involving the rehabilitation and improvement of certain sections of I-80 in Pennsylvania that included the preservation of existing concrete and the application of a thin asphalt overlay. *Id.* He explained that Midland's construction services include "the application of ultra-thin asphalt layering for preservation of pavement" for which it "utilizes a specialized paver to apply its proprietary formula of mix and polymer coating." *Id.*

Coleman noted that Midland submitted its quote and related information to Hawbaker "with the understanding that Hawbaker would maintain the confidentiality of Midland's information and not disclose the information to any third party, except as necessary for Hawbaker's bid to [DOT]." (R.R. at 51a-52a.) He noted that highway procurement bids are extremely competitive by nature and dependent on the specific technical services offered by a contractor and subcontractor, all of whom must closely guard their confidential information to limit a competitor's ability to review and incorporate such information into future

4

procurements. (R.R. at 52a.) He described the release of information such as that requested by Requester as having the potential of impairing competitive trade secrets and causing irreparable harm. *Id.* He explained that Midland "takes great pains to ensure that its confidentiality is protected," including closely restricting access to the documents submitted to Hawbaker to essential employees, providing confidentiality training to its employees, limiting disclosure of documents to Hawbaker and DOT, and destroying all non-essential copies of such documents. (R.R. at 52a-53a.)

Further, Coleman noted that "[t]here were only a handful of competitors offering services in Pennsylvania with the technical expertise and financial resources to provide the materials, equipment and construction services for the ultra-thin layering necessary for the Project," and that releasing the requested information would allow competitors to review how Midland structured its quote to Hawbaker and DOT and reverse engineer the same. (R.R. at 53a.) He described Midland's operational plans for the supply and layering of asphalt material as having independent economic value to Midland because it is not known by competitors and not reasonably ascertainable by proper means. *Id.*

Following submission of briefs, the OOR requested clarification as to which specific records contained the information sought in Items 1, 2, 3, and 5. (Final Determination at 3.) Requester submitted a response indicating that the CS-4171 certifications identified in Item 1 were standard forms used by material suppliers and submitted to DOT and he attached a blank form to his response as an exhibit. (R.R. at 71a, 73a-75a.) As to Items 2 and 3, Requester noted that the information would be contained in construction documentation that was required to be submitted to DOT in accordance with DOT's "Publication 2 Project Office Manual," relevant portions of which were also attached as an exhibit, as well as in the

5

daily records of a DOT inspector. (R.R. at 71a, 84a-87a.) As to Item 5, Requester noted that the information would be contained in a TR-448A Job Mix Formula Report, another standard form used by DOT, with a blank form attached as an exhibit. (R.R. at 72a, 88a-90a.)

Both DOT and Midland also responded to the OOR's request for clarification. (Final Determination at 3.) DOT submitted an exemption log to the OOR identifying the types of records in DOT's possession, explanations of the subject matter of these records, the applicable exemption, the corresponding item number in Requester's request, and the corresponding number of pages. (R.R. at 95a.) DOT also submitted an additional affidavit from Bernetski certifying that the documents reflected in the exemption log would be responsive to the request and maintaining that such documents were exempt from disclosure as trade secrets and confidential proprietary information. (R.R. at 97a-101a.) In its response, Midland simply reiterated its allegations that the information sought in Items 1, 2, 3, and 5 constituted a trade secret and confidential proprietary information. (R.R. at 91a-93a.)

**OOR's Final Determination**

On February 21, 2018, the OOR issued its Final Determination granting in part and denying in part Requester's appeal. More specifically, the OOR granted Requester's appeal solely as to 10 certificates of compliance dated October 18 to November 2, 2017, subject to DOT's redaction of the quantity, lot number, and material produced, which the OOR deemed to be confidential. The OOR denied Requester's appeal to the extent that he challenged the redaction of personal identification information from the certified payroll records, concluding that DOT met its burden of establishing that the redactions were justified under section

6

708(b)(6)(i)(A) of the RTKL, 65 P.S. §67.708(b)(6)(i)(A),[3] as well as this Court's decision in *Department of Conservation and Natural Resources v. Office of Open Records*, 1 A.3d 929 (Pa. Cmwlth. 2010) (holding that redaction of personal identification information from certified payroll records of third-party contractors was proper). The OOR also denied Requester's appeal to the extent that the remainder of the documents sought in Items 1, 2, 3, and 5 contained trade secrets or confidential proprietary information and, hence, were exempt from disclosure. The OOR concluded that DOT met its burden with respect to these exemptions based upon the affidavits of Bernetski and Coleman and the exemption log submitted by DOT.

The OOR noted that the 10 certificates of compliance showed the daily results of the asphalt plant, including its job mix formula, material class, and asphalt mix type. The OOR also noted that the exemption log revealed that the documents responsive to Requester's request included material quantities and mathematical equations relative to the computation of materials. The OOR concluded that such information was confidential and constituted trade secrets of Midland. Requester thereafter filed a petition for review with this Court.[4]

---

[3] Section 708(b)(6)(i)(A) provides that certain personal identification information is exempt from access under the RTKL, including "a person's Social Security number, driver's license number, personal financial information, home, cellular or personal telephone numbers, personal e-mail addresses, employee number or other confidential personal identification number."

[4] Requester did not raise any issue in his petition for review with respect to Item 4 and the redaction by DOT of the personal identification information from the certified payroll records.

## Discussion

On appeal,[5] Requester argues that DOT did not meet its burden of establishing that the withheld responsive records constitute or reveal trade secrets or confidential proprietary information. We disagree.

Under the RTKL, information is only subject to disclosure if it is a "public record." Section 301(a) of the RTKL, 65 P.S. §67.301(a). Pursuant to section 305 of the RTKL, 65 P.S. §67.305, a record in the possession of a Commonwealth agency shall be presumed to be a public record unless (1) it is exempt under Section 708 of the RTKL; (2) the record is protected by a privilege; or (3) the record is exempt from disclosure under any other federal or state law or regulation or judicial order. *McGowan v. Department of Environmental Protection*, 103 A.3d 374, 380 (Pa. Cmwlth. 2014). The agency receiving a RTKL request bears the burden of proving that the record is exempt by a preponderance of the evidence. Section 708(a) of the RTKL, 65 P.S. §67.708(a). The preponderance of the evidence standard, which is "the lowest evidentiary standard, is tantamount to a more likely than not inquiry." *Delaware County v. Schaefer ex rel. Philadelphia Inquirer*, 45 A.3d 1149, 1154 (Pa. Cmwlth. 2012). Section 708(b)(11) of the RTKL specifically provides an exemption for "[a] record that constitutes or reveals a trade secret or confidential proprietary information." 65 P.S. §67.708(b)(11).

---

[5] As to factual disputes, this Court may exercise functions of a fact-finder, and has the discretion to rely upon the record created below or to create its own. *Department of Labor and Industry v. Heltzel,* 90 A.3d 823, 828 (Pa. Cmwlth. 2014). As to a question of law under the RTKL, our scope of review is plenary. *Id.*

8

**Trade Secret**

Section 102 of the RTKL defines a "trade secret" as follows:

> Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:
>
> > (1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> The term includes data processing software obtained by an agency under a licensing agreement prohibiting disclosure.

65 P.S. §67.102. With the exception of the last clause, this definition is identical to the definition of a "trade secret" under section 5302 of the Pennsylvania Uniform Trade Secrets Act (Trade Secrets Act), 12 Pa.C.S. §5302.

In determining whether certain information constitutes a "trade secret," we look at the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Smith ex rel. Smith Butz, LLC v. Pennsylvania Department of Environmental Protection*, 161 A.3d 1049, 1064 (Pa. Cmwlth. 2017) (citing *Commonwealth v. Eiseman*, 85 A.3d 1117, 1126 (Pa. Cmwlth.

2014), *rev'd on other grounds*, 125 A.3d 19 (Pa. 2015)).[6]  A "trade secret" must be an "actual secret of peculiar importance to the business and constitute competitive value to the owner." *Parsons v. Pennsylvania Higher Education Assistance Agency*,

───────────────

[6] *Eiseman* involved an RTKL request for any and all documents that set forth the rate of payment, including but not limited to capitation rates, that the Department of Public Welfare (DPW) paid to Medicaid managed care organizations (MCOs) to provide coverage to recipients in southeastern Pennsylvania.  This request included the rates paid for dental services pursuant to established dental procedure codes and any payments made by an MCO for such services.  DPW refused to provide the requested information on the basis that the rates constituted trade secrets and/or confidential proprietary information that was protected from disclosure by, *inter alia*, the Trade Secrets Act and section 708(b)(11) of the RTKL.  The OOR, however, granted an appeal by the Requesters and directed DPW to disclose the records, concluding that the records constituted financial records to which the exception in section 708(b)(11) did not apply (section 708(c) of the RTKL, 65 P.S. §67.708(c), provides that "[t]he exceptions set forth in subsection (b) shall not apply to financial records.").

On appeal, this Court affirmed the final determination of the OOR relating to disclosure of capitation rates but reversed the final determination relating to disclosure of the rates paid by MCOs.  Regarding the former, we agreed with the OOR that the capitation rates constituted financial records to which the exception for trade secrets/confidential proprietary information set forth in section 708(b)(11) of the RTKL did not apply.  However, we held that the Trade Secrets Act could act as "stand-alone statutory basis for protection," *i.e.*, a "state law that takes precedence over other provisions in the RTKL," including section 708(c).  *Eiseman*, 85 A.3d at 1125. Nevertheless, we ultimately concluded that the MCOs failed to establish that such rates constituted trade secrets under the Trade Secrets Act.  Subsequent to our decision, DPW disclosed the capitation rates to Requesters.  Regarding the latter, we concluded that the MCO rates were not financial records because these rates were not disbursed by an agency, namely DPW, but instead were paid by the MCOs to providers.  Additionally, we held that such rates constituted confidential proprietary information that was protected from disclosure by section 708(b)(11) of the RTKL.

The dissenting opinion disagreed with the Majority's conclusion that the MCO rates were not financial records simply because they were disbursed by the MCOs rather than DPW and, consequently, that the trade secrets/confidential proprietary information exception could apply to the same.  Further, the dissent disagreed with the Majority to the extent that it concluded that the Trade Secrets Act constituted an independent, "stand-alone statutory basis for protection" from disclosure.  *Id.* at 1138.  Our Supreme Court in *Eiseman* agreed with the dissenting opinion and reversed this Court's decision as to the MCO rates.

910 A.2d 177, 185 (Pa. Cmwlth. 2006). "The most critical criteria are 'substantial secrecy and competitive value.'" *Eiseman*, 85 A.3d at 1126.

Generally, courts have held that where alleged secrets are commonly understood in an industry or readily available to the public, such as in public patent filings or trade publications, they do not receive trade secret protection. *See, e.g., Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 452 (E.D. Pa. 2014) (holding that alleged trade secret information that was generally known in the industry and available through trade publications was readily ascertainable and therefore not entitled to trade secret protections); *Midland-Ross Corporation v. Sunbeam Equipment Corporation*, 316 F. Supp. 171, 177-78 (W.D. Pa.), *aff'd*, 435 F.2d 159 (3d Cir. 1970) (finding that "[t]he very act of publishing a trade secret in a patent destroys the secretive nature of that which is disclosed therein" and "[m]ethods of manufacture or design and details of construction which are matters of general scientific knowledge in the industry do not constitute trade secrets").

However, courts have found "trade secrets" to include "certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated." *Union Carbide Corporation v. UGI Corporation*, 731 F.2d 1186, 1191 (5th Cir. 1984) (protecting marketing information and strategies); *BIEC International, Inc. v. Global Steel Services, Ltd.*, 791 F. Supp. 489, 545 (E.D. Pa. 1992) (protecting cost and pricing information for the final product); *Alexander & Alexander, Inc. v. Drayton*, 378 F. Supp. 824, 833 (E.D. Pa. 1974) (protecting the terms of specific customer accounts); *Air Products*

11

*and Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1121 (Pa. Super. 1982) (protecting business plans and financial projections);.

Further, courts have held that a compilation of data that has independent economic value can be protected as a trade secret. *Amerisourcebergen Drug Corporation v. American Associated Druggists, Inc*., (E.D. Pa., Civil Action No. 05-5927, filed January 29, 2008), 2008 U.S. Dist. LEXIS 6611, *citing National Risk Management, Inc. v. Bramwell*, 819 F. Supp. 417, 430-31 (E.D. Pa. 1993) (holding that customer information, such as costing and price information compiled by a business, represents a material investment of time and money and constitutes a valuable asset).

We reiterate that the burden on an agency seeking an exemption is very low, merely a preponderance of the evidence. In order to meet its burden in the present case, DOT submitted the affidavit of Bernetski, Civil Engineer Supervisor for DOT's Engineering District Office 4. Additionally, Midland submitted an affidavit from Coleman, a Senior Executive for the company. In his affidavit, Bernetski explained that Midland's personnel understand that certain information "should not be subject to public access, including the proprietary mix formula for asphalt from which production quantities can be extracted and pricing information can be reverse engineered." (R.R. at 40a.) He also noted that the requested records "contain[ed] information, that derive[d] independent economic value, which [was] not generally known or readily ascertainable," the disclosure of which would be of economic value to a competitor. (R.R. at 41a.) Further, while Requester contends that he is not seeking any information regarding Midland's methods and operations to provide ultra-thin layering, but only asks for certifications that Midland used materials that meet the Project specifications set by DOT, Bernetski noted that "[t]he production

12

quantities utilized in a competitive construction market is proprietary by its very nature" and that, "[i]n the hands of a competitor, the details submitted by [Midland] could be used to reverse engineer bid information." *Id.* Hence, he described this production information as having "independent economic value" itself. *Id.*

Likewise, in his affidavit, Coleman stressed that Midland utilized a "proprietary formula of mix and polymer coating" for its ultra-thin asphalt as well as a "specialized paver" to apply the same. (R.R. at 51a.) He explained that Midland submitted its bid to Hawbaker "with the understanding that Hawbaker would maintain the confidentiality of Midland's information and not disclose the information to any third party, except as necessary for Hawbaker's bid to [DOT]." (R.R. at 51a-52a.) He described bids submitted in response to a highway procurement as, "by their nature, extremely competitive" and something that must be protected from use against the bidder "in future procurements." (R.R. at 52a.) Coleman also noted that DOT routinely maintains bids as confidential so as not to impair a contractor's competitive advantage or cause irreparable harm. *Id.* He indicated that Midland takes steps to protect the information contained in its bids, including restricting "access to the documents submitted to Hawbaker to only those employees essential to preparation of [its] quote"; providing "confidentiality training to its employees"; only disclosing the documents to Hawbaker; and destroying "all non-essential copies of the documents submitted to Hawbaker and [DOT]." (R.R. at 52a-53a.)

If a competitor was able to obtain the information requested by Requester herein, Coleman stated that a competitor would be able to "reverse engineer Midland's quote, and then use that information to undercut Midland's ability to contract in the future." (R.R. at 53a.) More specifically, he indicated that a

competitor could utilize the requested information "to simulate the processes that Midland developed for its own use" or "to tailor and to structure their layering processes as well as the materials and equipment used to the competitive disadvantage of Midland." *Id.* As Midland notes in its brief, the proprietary methods, techniques, and processes it uses in applying an ultra-thin layering of asphalt is its "stock in trade" and neither the description of the same or the data points it uses to measure productivity, which Requester essentially seeks herein, are publicly available. (Brief of Midland at 21.)

With the presentation of the affidavits of Bernetski and Coleman, DOT and Midland have established by a preponderance of the evidence that the information requested by Requester constitutes or reveals "trade secrets" and, hence, this information is exempt from disclosure under section 708(b)(11) of the RTKL.

## Confidential Proprietary Information

Section 102 of the RTKL defines "confidential proprietary information" as follows:

> Commercial or financial information received by an agency:
>
> (1) which is privileged or confidential; and
>
> (2) the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information.

65 P.S. §67.102. In determining whether certain information is "confidential," the OOR must consider "the efforts the parties undertook to maintain . . . secrecy." *Smith ex rel. Smith Butz, LLC*, 161 A.3d at 1064 (citing *Eiseman*, 85 A.3d at 1128). "In

14

determining whether disclosure of confidential information will cause 'substantial harm to the competitive position' of the person from whom the information was obtained, an entity needs to show: (1) actual competition in the relevant market; and, (2) a likelihood of substantial injury if the information were released." *Smith ex rel. Smith Butz, LLC*, 161 A.3d at 1064. "Competitive harm analysis 'is limited to harm flowing from the affirmative use of proprietary information by competitors.'" *Id.*

The efforts taken by Midland to maintain the secrecy of the information provided to Hawbaker, and then passed on to DOT, are detailed above and need not be reiterated here. Suffice it to say, the efforts undertaken by Midland established that such information is confidential. As to the potential for disclosure of such information to cause substantial harm to Midland's competitive position, both Bernetski and Coleman described the highway construction market as highly competitive and detailed the likelihood of substantial injury to Midland should this information be released, thereby satisfying the necessary prongs of the competitive position analysis. More specifically, Bernetski described the construction market as "competitive" and noted that the "production quantities utilized in [such a market] is proprietary by its very nature." (R.R. at 41a.) Additionally, he stated that "[i]n the hands of a competitor, the details submitted by the contractor could be used to reverse engineer bid information," which would effectively harm that contractor's competitive position on future contract bidding. *Id.*

Likewise, Coleman noted that Midland routinely submits quotes to heavy and highway contractors in competitive bidding processes throughout the United States and described such processes as "extremely competitive." (R.R. at 52a.) He also described the highway construction market, and in particular the application of an ultra-thin layering of asphalt, as a "highly-competitive market."

15

(R.R. at 53a.) He also explained how the release of the requested information would damage Midland's competitive position, noting that the release of the same would allow a competitor to be able to "review how Midland structured its quote to Hawbaker and [DOT], including the financial terms, the expertise of its employees, and the materials, equipment and technical processes" used for the Project at issue, which could be used to undercut Midland's ability to contract in the future. *Id.* He also stated that a competitor could use this information "to tailor and to structure [its] layering processes as well as the materials and equipment used to the competitive disadvantage of Midland." *Id.*

Through the affidavits of Bernetski and Coleman, DOT and Midland have established by a preponderance of the evidence that the information requested by Requester constitutes "confidential proprietary information" and, hence, this information is exempt from disclosure under section 708(b)(11) of the RTKL.

Accordingly, the OOR's Final Determination is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

Judge Cohn Jubelirer did not participate in this decision.

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Terry Crouthamel, Jr.,         :
           Petitioner        :
                              :   No. 295 C.D. 2018
           v.               :
                              :
Department of Transportation,  :
           Respondent    :

## ***ORDER***

AND NOW, this 5th day of April, 2019, the Final Determination of the Office of Open Records, dated February 21, 2018, is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge